UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                        Plaintiff,

v.                                          Case No. 11-CR-209-JPS

JOSEPH D. GRENIER,

                       Defendant.                  ORDER

On October 31, 2011, defendant Joseph D. Grenier ("Grenier") filed a Motion to Suppress (Docket #9) requesting the court suppress certain statements made to law enforcement connected to his arrest on July 7, 2011. After an evidentiary hearing and subsequent briefing by the parties, Magistrate Judge Nancy Joseph issued her Recommendation (Docket #19), expressing the opinion that Grenier's motion be granted. The United States has timely filed an objection to that recommendation.

1.      Facts.

After review, the court adopts the factual findings of the magistrate. On July 7, 2011, the Milwaukee Police Department dispatched Officers Burgos and Becerra to a "subject with gun" complaint in the 2600 block of South 6th Street. Upon arriving, the officers observed Grenier's wife and an ambulance, after which Grenier's wife told police that Grenier had beat her and tried to kill her by placing a gun to her head. While interviewing Grenier's wife, Grenier approached the driver's side of the squad car, knocked on the glass and stated, "I'm the one you're looking for; I guess I'm going to jail." Officer Burgos exited the vehicle, handcuffed Grenier, and placed him in the back seat of the squad car.

Officer Burgos remained in the vehicle with Grenier and, at 11:14 p.m., turned on the vehicle's video recorder while Officer Becerra spoke with Grenier's wife. The video shows Grenier was agitated and angry, crying and yelling loudly for his wife. He also asked for cigarettes and to roll down the window. Grenier repeatedly denied doing anything wrong and repeatedly stated he wanted to apologize to and speak with his wife. At approximately 11:23 p.m., Grenier asked Officer Burgos what his wife said he did to her. Officer Burgos told Grenier that his wife said he pushed her; Grenier denied pushing her and stated she fell down on her own because she was having an anxiety attack. Officer Burgos responded that Grenier's wife had admitted she fell on her own, after which Grenier asked what else she was "putting on" him. Officer Burgos responded that pushing and shoving was enough.

Grenier continued to ask what else his wife was "putting on" him, to which Officer Burgos responded, "well you can't be around guns either." Grenier denied being around guns after which Officer Burgos stated, "you didn't say you were going to throw her guns in the river?" Grenier replied, "if I got her guns I would throw them in the river," and stated that he told his wife they did not need guns and he wanted to get rid of them. After a few minutes, Grenier admitted he told his wife he would throw her guns in the creek, but explained he did not have access to them because they were in a safe to which he did not have the password. Officer Burgos told Grenier he could not be around guns, even in a safe. Officer Burgos then asked Grenier if his official statement was, "I would never do anything to hurt my wife," to which Grenier responded by repeating the statement. Officer Burgos then asked Grenier administrative booking questions. Grenier answered and asked about the difference between battery and disorderly conduct, which Officer Burgos answered.

At roughly 11:35 p.m., Officer Burgos exited the vehicle, then returned three minutes later. Officer Burgos told Grenier "you're talking a lot of stuff right now, and I want to make sure you're not abused." Officer Burgos read Grenier his *Miranda* rights and asked whether he understood them. Grenier said yes and asked what he was being charged with. Officer Burgos asked if Grenier was willing to answer questions or make a statement, knowing he had rights. Grenier paused, then asked again what he was being charged with. Officer Burgos explained the charges, including being a felon in possession of a firearm. The conversation between the two continued from 11:38 p.m. until 12:25 a.m. Officer Burgos informed Grenier the most serious charge he faced was "you can't be around guns." At 11:42 p.m., Grenier asked Officer Burgos to tell his wife to remove the guns from the house so he could be there, to which Officer Burgos responded that Grenier "bought the guns." Grenier stated that he gave his wife money to buy guns. Officer Burgos asked why and Grenier responded he did not think his wife would store them in the house. Officer Burgos responded, "where else is she going to keep them…you said you bought them for home protection." Grenier admitted to touching one of the guns. He also asked questions about what guns were found and which he was being charged with, to which Officer Burgos responded, "the ones you bought." Officer Burgos told Grenier that giving his wife money to buy guns was the same as buying them for her. At 12:03 a.m., Officer Burgos asked which pistol was in the car, the black one or silver one, to which Grenier responded he did not remember because "everything happened so fast." Officer Burgos asked if he remembered where the guns were in the car and Grenier responded that they might be outside and he could help find them. At 12:18 a.m., Grenier asked Officer

Burgos if he knew where the guns were and Officer Burgos asked "where were they?" Grenier stated he knew exactly where they were and told him his wife threw "the clip and the nine" on the pool cover in the backyard and he could show the officers where to find them. At 12:25 a.m., the officers and Grenier arrived at the station and the video ends.

2. Analysis.

The court will adopt the magistrate's recommendation in part, granting the defendant's motion in part and denying it in part. The court reviews *de novo* that portion of the recommendation to which the government objects. 28 U.S.C. § 636(b)(1). In his motion, Grenier requests suppression of both his pre- and post-*Miranda* statements, and Magistrate Joseph, in turn, recommended granting the motion in its entirety, including an analysis of Grenier's pre-*Miranda* statements. First, noting that Grenier seeks only suppression of his statements related to the subject of guns, the magistrate concluded that Officer Burgos had engaged in interrogation, and thus those statements should be suppressed. The government raises no objection to that conclusion,[1] despite asking the court to deny the motion in its entirety. Thus, without objection, the court adopts that portion of the magistrate's recommendation, finding interrogation occurred pre-*Miranda*, and will suppress the pre-*Miranda* statements related to the subject of guns.

Moving to the post-warning statements, the court agrees with some of the magistrate's analysis, but disagrees with the conclusion and thus finds the statements admissible. The U.S. Supreme Court has rejected the fruit of the poisonous tree doctrine in analyzing the admissibility of a warned

---

[1] In fact, the government's brief seems to explicitly accept that interrogation occurred prior to the *Miranda* warnings. (*See* Pl.'s Obj. at 8) (Docket #27) ("in the present case, the initial interrogation was brief").

confession subsequent to an initial failure to administer *Miranda* warnings. *Missouri v. Seibert*, 542 U.S. 600, 612 n.4 (2004). *Seibert* put forth the analysis for a two-step interrogation process, but that decision was decided without a majority, giving rise to two tests: Justice Kennedy's intent-based test; and the plurality's multi-factor test. *United States v. Lee*, 618 F.3d 667, 678 (7th Cir. 2010). Unfortunately, the Seventh Circuit has yet to confront a situation in which it is forced to choose between the two tests, or to distill a test from both. *Id.* at 678; *United States v. Heron*, 564 F.3d 879, 885 (7th Cir. 2009). As such, the magistrate analyzed Grenier's statements under both tests.

The government first argues that *Seibert* is distinguishable because neither officer in the instant case, unlike *Seibert*, deliberately used a "question first" strategy. However, the argument is essentially an implicit argument that this case would not satisfy Justice Kennedy's intent-based test. Here, the magistrate found that Officer Burgos' questioning would not meet Justice Kennedy's intent-based test for suppression, and Grenier has not objected to that finding. Further, the court agrees that there is not sufficient evidence to establish the intent of the officers to deliberately sidestep *Miranda*. Thus, while noting that the court agrees with that conclusion, it will not proceed with further analysis, and simply adopt that portion of the magistrate's recommendation. The government also briefly argues that here the *Miranda* warnings were not given "midstream," as in *Seibert*, but points only to facts that bear on the plurality's test.[2] The court deals with that test next. In sum, these arguments seek to establish that, where no intentional two-step process

---

[2]To the extent the government means to actually contest whether there was pre- and post-*Miranda* interrogation, it does not make that point clear, particularly given the seeming admission in its own brief that interrogation occurred pre-*Miranda* warning. *See supra* note 1.

can be discerned, *Seibert* is inapplicable. However, the plurality's opinion, particularly as clarified by Justice Kennedy's concurrence, indicate that a two-step process may occur unintentionally as well. 542 U.S. at 615-16, 621 (analyzing whether conversations were distinct experiences; Justice Kennedy writing that the plurality's test "envisions an objective inquiry from the perspective of the suspect, and applies in the case of both intentional and unintentional two-stage interrogations"). As such, *Seibert* applies so long as the case can be made that interrogation occurred prior to and subsequent to *Miranda* warnings. Thus, *Seibert* is not distinguishable other than to the extent that this case does not satisfy either of its tests.

Regarding the plurality's test, the main focus is on "whether *Miranda* warnings delivered midstream [can] be effective enough to accomplish their object." *Seibert*, 542 U.S. at 615. In comparing the *Seibert* facts to a prior case, the Court noted that in the earlier *Elstad* case a reasonable person would have seen the second interrogation "as a new and distinct experience." *Id.* On the other hand, on the facts before the Court in *Seibert*, the comprehensibility and efficacy of *Miranda* warnings had been challenged "to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk." The Court considered these factors: completeness and detail of questions and answers in the first round of interrogation; overlapping content of the two statements; timing and setting of both interrogations; continuity of police personnel; and degree to which questions treated the second round as continuous with the first. *Id.* at 615. The magistrate first found that the completeness and detail of questions and answers were far less in the first

round of interrogation than the second. The government agrees, and the court finds no reason to disagree with that finding.

As to the second factor, the magistrate found that, while the second round was much more detailed, the subject matter remained the same, namely guns, and thus the two rounds overlapped in content. The government disputes this, arguing that the first round primarily consisted of pedigree questions, and only once was a firearm discussed, and only in the context of relaying Grenier's wife's statement and attempting to confirm whether it was accurate. While questions regarding guns may not have made up the majority of the first round, the content of the statements regarding guns did overlap to an extent. However, the overlap is minimal in that the statements cover only the most basically similar subject matter. The actual pre-*Miranda* statements, at best, imply that Grenier's wife had guns in their home. While the post-*Miranda* statements also imply the basic fact of Grenier's presence near guns, the content of the statements overlap no further than that. Thus, though there is minor overlap, the court disagrees with the magistrate that this factor weighs in favor of suppression.

The magistrate found that the third and fourth factors favored suppression, the government does not dispute those conclusions and the court agrees without going into further analysis. As to the final factor, whether the questions treated the two rounds as continuous, the magistrate found that the encounter was continuous given Officer Burgos' awareness that the investigation involved a gun which other officers were looking for, that guns were discussed before any recovery, and that only a three-minute lapse between the unwarned and warned conversations was even shorter than the break in *Seibert*. The government disputes this finding, arguing that

Officer Burgos did not view the interviews as continuous and that, after learning that a firearm had been recovered, he advised Grenier that the situation had changed and he would be charged with being a felon in possession of a firearm. However, Officer Burgos' subjective opinion on the continuity of the interrogation is irrelevant, as the plurality's test focuses on the experience of the defendant. Moreover, despite the government's assertion, Officer Burgos had, in fact, informed Grenier in the first interview that he might be in trouble for being around guns, regardless of whether he told Grenier he was explicitly being charged with such. The government also points out that Officer Burgos did not refer to anything discussed in the first interview. While true, it is also the case that guns were discussed both before and after the *Miranda* warning. The combination of these facts, in addition to the small period of time between conversations leads the court to agree with the magistrate that a person in Grenier's shoes would reasonably view the entire span as one continuous interview session.

That said, as Magistrate Joseph noted, the goal of the test is to look at the totality of the circumstances, and, in that regard, the court disagrees with her recommendation that Grenier's post-warning statements should be suppressed. It is a close call, but while the setting, continuity of personnel, and continuous nature of the interrogations do support suppression, they are outweighed by the disparate levels of detail and minimal overlap between the questioning and statements during each round. While someone in Grenier's shoes may not have viewed the two sessions as new and distinct experiences, the very small amount of information offered by Grenier pre-warning, in addition to Officer Burgos' added statement that he did not wish Grenier to be abused before administering the warnings, would lead a

reasonable person to believe they had a choice as to whether to continue speaking post-warning. The magistrate noted that Grenier hesitated post-warning before continuing to speak, until he was told he would be charged with being a felon in possession of a firearm, and that this casts doubt on the efficacy of the warnings. While the court agrees that it casts some doubt, implying that Grenier continued only because he believed he was already up a creek, that possibility simply does not outweigh the minimal amount and scope of interrogation that occurred prior to the warning as well as Officer Burgos' added emphasis on the warning being a safeguard for Grenier. As such, the court is obliged to deny Grenier's motion in part.

Accordingly,

IT IS ORDERED that Magistrate Judge Nancy Joseph's January 5, 2012 Recommendation (Docket #19) be and the same is hereby ADOPTED in part;

IT IS FURTHER ORDERED that the defendant's Motion to Suppress (Docket #9) be and the same is hereby GRANTED in part and DENIED in part. The defendant's pre-warning statements concerning guns are hereby suppressed. The defendant's post-warning statements are admissible.

Dated at Milwaukee, Wisconsin, this 9th day of February, 2012.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge